UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>JOEY R. HOLLIWAY,<br><br>        Defendant. | Case No.:  5:23-cr-00003-CDB<br><br>ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS<br><br>(Doc. 9)<br><br>ORDER DIRECTING PARTIES TO FILE JOINT REPORT<br><br>**14-Day Deadline** |

Defendant Joey Holloway is charged by information with violation of 43 C.F.R. § 8365.1-4(b)(2) – Possession of Controlled Substance. (Doc. 1).  Pending before the Court is his motion to suppress, filed July 23, 2024, and supported by exhibits and lodged body worn camera footage. (Docs. 9, 9-1).  On September 2, 2024, the government filed an opposition supported with declarations by two law enforcement officers involved in the encounter giving rise to Defendant's charging.  (Doc. 12).  Defendant filed a reply on September 27, 2024.  (Doc. 15).  The Court convened for hearing on Defendant's motion to suppress on November 5, 2024, at which both of the law enforcement officers who submitted declarations testified.  The parties filed supplemental briefing following the suppression hearing.  (Doc. 18, 21, 22)

///

///

**Factual Background**

This case involves law enforcement officers' search of a vehicle and recovery therein of suspected marijuana and a box containing suspected methamphetamine following one of the officer's observations of a bong in the back of the vehicle as he walked around it.   Upon questioning by law enforcement about the seized box, Defendant admitted it was his.

According to law enforcement reports, body worn camera footage, testimony introduced during the hearing on Defendant's motion to dismiss and declarations of the two witnesses that testified, at approximately 7:52pm on July 27, 2023, Rangers Timothy P. Brown and Charles D. Sutton, while on patrol as law enforcement officers with the U.S. Department of Interior – Bureau of Land Management, observed two parked vehicles in the Erskine Creek Area in Kern County. The two vehicles were a Chevy truck ("Truck") and a Honda CRV ("Honda").   The Rangers observed five adults in the general vicinity of the vehicles and noted that the Truck had a raised hood.

Upon exiting their vehicle, the Rangers made contact with Yolanda Lomely near the rear of the truck.   Lomely, who was wearing a jacket, backpack, and carrying a grocery store-style plastic bag, explained to Ranger Brown that she and her friends had stopped to help the occupants of the Truck and that the Truck's starter had lost some bolts.   Lomely further explained that the driver of the Truck, whom she identified as "Ms. Tiny" (later determined to be Jannae Wren) was a woman and it was getting dark.

Shortly after this initial exchange with Lomely, the Rangers approached the Truck and observed a person working underneath the truck (Thomas Moline), a passenger (Jimmy Newman), and Wren (the Truck's reported driver).   As the Rangers maneuvered around the vehicles, Ranger Sutton used a flashlight to peer into the Truck.   Ranger Brown's body worn camera reflects that he peered into the Honda and observed the passenger seated therein smoking a cigarette (Defendant Holloway).   After their initial canvas of the vehicles, the Rangers returned to the rear of the vehicles and Ranger Brown reported to Ranger Sutton, "I didn't see anything on the walk-around."   Thereafter, Ranger Sutton returned to the area between the vehicles and alternated making observations of the interiors of the Truck and Honda.   Although there were two

dogs in or near the Honda, there is no indication that the dogs presented any impediment to the Rangers' ability to fully observe the interior of the vehicles.

Thereafter, Ranger Sutton approached the vehicles and stood in between them as he looked inside each.  Approximately six minutes after their initial encounter with Lomely, Ranger Sutton walked around the Honda and, shining his flashlight inside, circled the driver-side and rear of the Honda while peering inside.  Approximately nine minutes and 50 seconds after the initial encounter with Lomely, Ranger Brown walked to the passenger-side of the Honda and greeted Defendant Holloway.

Shortly afterward, Ranger Sutton reported to Wren that he observed what he identified as a methamphetamine pipe in the passenger seat of the Truck and asked Wren for identification. The Rangers proceeded to their vehicle with Wren and spent approximately 11 minutes working with their dispatch to investigate the status of Wren. Wren denied knowledge of the pipe observed in the Truck and suggested she ask the passenger about it (Newman).

Approximately 24 minutes after the Rangers' initial encounter with Lomely, Ranger Brown approached Newman and asked whether he knew who owned the "meth pipe" observed in the Truck.  Newman stated the pipe was his.

Several minutes later, Ranger Brown approached Moline and Lomely while they worked on the Truck and directed them to move to the other side of the Honda as he intended to search the Truck.  Lomely immediately stated to Moline (within earshot of Ranger Brown), "we got to stop here Tom .. just let it go," apparently referencing the work they had undertaken to fix the disabled Truck.  Moline answered, "well, I guess that's it then … it's dark."

Lomely and Moline gathered their belongings and entered the Honda.  Upon starting the engine, Ranger Sutton (stationed near his vehicle) asked Ranger Brown what the occupants were doing, prompting Ranger Brown to inform the occupants they could not leave the scene.  Ranger Brown explained he only needed them to remain away from the Truck and reiterated, "you can't leave yet."  While the occupants remained in the Honda, Ranger Brown directed them to exit the vehicle and move towards the Rangers' vehicle.  Ranger Brown then commenced a search of the Truck that lasted approximately four minutes during which he located suspected

methamphetamine inside a plastic container on the passenger seat floorboard.  Ranger Sutton remained at his vehicle during the search.  Ranger Brown asked the Truck's occupants who owned the plastic container and Newman claimed it.

The Rangers' investigation of the Truck and its occupants continued for approximately 38 minutes while the Honda occupants remained fixed at the rear of the Rangers' vehicle.  After completing their investigation of the Truck, Ranger Brown asked Ranger Sutton if they had any reason to further investigate identities of the Honda occupants. Ranger Sutton asked, "Did you plain view the car?" Ranger Brown responded that he did, but he could do so again. He clarified that "it was hard with all the dogs on the ground," apparently referencing the two dogs that were present when he initially circled the Honda to look inside.  Ranger Brown proceeded to peer inside the Honda with a flashlight and observed what he perceived to be a bong.  After the Honda's owner (Moline) denied knowledge of the bong, the Rangers searched the Honda and discovered suspected marijuana and a small box containing suspected methamphetamine.  The Rangers asked the Honda occupants whether "anyone [is] going to claim" ownership of the box; Defendant responded that the box was his.  Asked whether the box contained methamphetamine, Defendant stated he did not know.

Newman and Defendant Holloway were cited at the scene for possession of a controlled substance in violation of 43 C.F.R. 8365.1-4(b)(2).

**<u>Governing Legal Standard</u>**

The Fourth Amendment, applicable to the United States and made applicable to the states by the Fourteenth Amendment, protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." *United States v. Willy*, 40 F.4th 1074, 1079 (9th Cir. 2022) (citing U.S. Const. amend. IV).   Under the Fourth Amendment, a law enforcement officer may not seize a person without a reasonable suspicion of criminal activity.  *United States v. Mendoza-Cepeda*, 250 F.3d 626, 628 (9th Cir. 2001).  To form a reasonable suspicion, the officer must have "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Lopez–Soto*, 205 F.3d 1101, 1105 (9th

1    Cir. 2000) (internal quotation marks omitted).  Accord *United States v. Cotterman*, 709 F.3d 952,

2    968 (9th Cir. 2013) (citation omitted) ("Reasonable suspicion is defined as a particularized and

3    objective basis for suspecting the particular person stopped of criminal activity.").

4         Not all interactions between police and citizens involve "seizures" for Fourth Amendment

5    purposes.  *See Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  "Only when the officer, by means of

6    physical force or show of authority, has in some way restrained the liberty of a citizen may we

7    conclude that a 'seizure' has occurred."  *Id*.  Stated differently, "the crucial test is whether, taking

8    into account all of the circumstances surrounding the encounter, the police conduct would 'have

9    communicated to a reasonable person that he was not at liberty to ignore the police presence and

10   go about his business.'"  *Florida v. Bostick*, 501 U.S. 429, 436 (1991) (quoting *Michigan v.*

11   *Chesternut*, 486 U.S. 567, 569 (1988)).

12        For instance, a seizure ordinarily is not implicated when a law enforcement officer merely

13   approaches an individual, identifies himself and asks questions.  *See Florida v. Royer*, 460 U.S.

14   491, 497 (1983) (plurality opinion).  Likewise, "an officer's approach of a car parked in a public

15   place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure."

16   *United States v. Kim*, 25 F.3d 1426, 1430 & n.1 (9th Cir. 1994) (citing cases).  *See United States*

17   *v. Soto-Valencia*, 500 Fed. Appx. 589, 590 (9th Cir 2012) ("Soto-Valencia's voluntary decision

18   to stop his vehicle and converse with Officer Thomas for the first 30 seconds or so of the

19   encounter did not implicate the Fourth Amendment.").  During such consensual encounters, law

20   enforcement generally may engage in basic investigatory procedures – such as asking questions

21   or requesting identification – without implicating the Fourth Amendment.  *See Bostick*, 501 U.S.

22   at 437 (stating that such actions are permissible "as long as the police do not convey a message

23   that compliance with their requests is required").

24        **Discussion**

25        The parties do not dispute that the encounter between Defendant and Rangers Sutton and

26   Brown initially constituted a consensual encounter that escalated to a Fourth Amendment seizure

27   necessitating reasonable suspicion at the moment Ranger Brown directed the Honda occupants to

28   stop attempting to depart the area.  (Doc. 12 at 8).  Having considered the totality of

5

circumstances, the Court agrees with the parties that the consensual encounter became a seizure or investigatory detention at the moment Ranger Brown told the Honda occupants they were not free to depart.  *E.g., United States v. Melgoza*, No. 22-10276, 2024 WL 1502498, at *2 (9th Cir. Apr. 8, 2024) ("the question of whether Melgoza was ultimately 'seized' during the [consensual] encounter turns on whether, in light of 'all the circumstances,' Officer Nousch's 'conduct would have communicated to a reasonable person that the person was not free to decline [his] requests or otherwise terminate the encounter'") (quoting *Bostick*, 501 U.S. at 439).  Thus, the Court must determine whether, at the moment the Rangers commanded the Honda occupants to stop driving away, reasonable suspicion justified the inception and length of the seizure.

In arguing that the seizure of the Honda occupants was adequately supported by reasonable suspicion, the government relies on the fact that the Honda was discovered in a "high crime" area "well-known" for drug use.  The government also argues that "the objective evidence available to [the] rangers suggested that everyone at the scene were part of one group, traveling together," such that evidence of drug paraphernalia found in the Truck is a factor contributing to a finding of reasonable suspicion that the Honda occupants were engaged in criminal activity.  The government further argues that one of the occupants of the Honda (Lomely) "exhibited signs that were indicative of being then-currently under the influence of a controlled substance."  Finally, the government notes that the Rangers "found it suspicious that the occupants of the Honda attempted to leave the scene when merely asked to move to the side so that a search of the Truck could be conduct."  (Doc. 12 at 8-10).

High crime area:  although the fact of a suspect's presence in a high crime area alone cannot establish reasonable suspicion, it is a relevant factor to be considered.  *E.g., United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002).  But this factor carries little persuasive weight here under the totality of circumstances analysis.  Although Ranger Sutton attests in a post hoc declaration and testified at the suppression hearing that the area where Defendant was encountered was a high crime area, he conceded in his testimony that he could not reasonably conclude that Defendant was in a high crime area in connection with committing crime.  Instead, as Ranger Sutton conceded in his testimony, the most likely reason Defendant was in the area was

because the Truck became disabled there, not because he chose to stop there.  Thus, the Rangers could not draw any "reasonable inference" that Defendant was in a high crime area for the purpose of committing crime.  *E.g.*, *United States v. Kitchen*, 11 Fed. Appx. 844, 846 (9th Cir. 2001) (finding no reasonable suspicion to justify defendant's seizure based on officers' observation of suspected hand-to-hand transaction in high crime area; reasoning "[t]he evidence here is consistent with the conclusion that one man asked another man, who was leaving a store, bag in hand, for money. The customer gave the other man a quarter, and the two parted ways. This exchange is not uncommon in convenience store parking lots, even in high-crime areas").

Travelling as group:  both Rangers attest in their post-hoc declarations that they believed all five people they encountered at the scene "were part of one group" because the vehicles were parked together and, in that area of BLM land, "people who do not know each other" tend to isolate.  During his testimony, Ranger Sutton reiterated this notion and added that he also believed all five were friends because Lomely referred to Wren as "Ms. Tiny" (supposedly showing their mutual familiarity).  The government implies that based on this mutual association, the Rangers' observation of drug paraphernalia in the Truck strengthens the reasonable suspicion that the occupants of the Honda, too, were engaged in criminal activity.

To begin with, the Rangers' belief that the Honda occupants were associated with the Truck occupants, while not unreasonable, is thin at best.  Lomely offered an explanation for the Honda occupants' presence at the roadside when the Rangers first made contact with her that was at least equally as reasonable as the Rangers' hunch: that the Truck was disabled, it was getting dark, and the Honda occupants stopped to assist.  As for Lomely's purported familiarity with Wren by referring to her as "Ms. Tiny," Ranger Sutton conceded during his testimony that it would be reasonable for a person to refer to a stranger by a physical characteristic – such as "Ms. Tiny" here – instead of any unknown name.  The government points to no other evidence or information learned by the Rangers' during their investigation at the scene (lasting over an hour) to either support the notion that the five people were travelling as a group or refute Lomely's explanation that the Honda occupants were assisting the travelers in the disabled Truck.

Separately, even if the Honda occupants were acquainted with the Truck occupants, it is a

1   leap of logic to argue that the observation of a meth pipe in the Truck raises reasonable suspicion
2   that the occupants of the Honda were engaged in criminal activity.  The government's argument
3   that, having admitted the pipe was his, Newman either concealed it from Wren during their drive
4   together to Erskine Creek or obtained the pipe from the Honda occupants (Doc. 12 at 9) is
5   unpersuasive and unsupported by the evidence.   In particular, neither Ranger memorialized this
6   proposition in a report or attested that they thought it was more likely the Honda occupants were
7   involved in illegality because he observed a meth pipe in the Truck.  Instead, the evidence reflects
8   that both Ranger Sutton and Ranger Brown conducted plain view observations of the Honda's
9   interior before observing the pipe in the Truck and did not similarly observe any evidence of
10  criminal activity.

11      <u>Occupants of Honda acting strangely</u>:  Ranger Sutton testified that he has received training
12  on the behaviors a person under the influence of controlled substances might exhibit, including
13  overly fast or slow speech patterns or wearing clothing that is not matched to the existing weather
14  conditions.  In his report of the incident, Ranger Sutton wrote: "[b]ased upon the totality of
15  circumstances and human behavior observed: fast speech patterns, and not being capable to
16  remain still; the Honda was stopped."  (Doc. 9-1 at 11).  These appear to be summary
17  characterizations of his observations of one of the Honda's occupants (Lomely).

18      In his declaration (signed one year after the incident) and during his suppression hearing
19  testimony, Ranger Sutton conceded that his post hoc review of body worn camera footage did not
20  corroborate his reported impression during his encounter with Lomely that she was speaking
21  unusually fast.  He did testify that Lomely was wearing a jacket and carrying a backpack during
22  the incident, which he found unusual given the summer heat and which was consistent with
23  behavior of a person under the influence of a controlled substance.  However, the force of this
24  proposition was undermined by his testimony that (1) Lomely was wearing shorts, (2) the jacket
25  she wore was not heavy, and (3) people commonly carry backpacks in BLM-managed lands.

26      The government points to other purported indicia of Lomely's "strange behavior," such as
27  her offer of unsolicited information in response to the Rangers' questioning. (Doc. 12 at 2).  For
28  instance, the government points out that, in response to a question by the Rangers whether any of

the Honda occupants were on probation or parole, Lomely responded that she was not, but had been the victim of identity theft. (Doc. 12 at 5).  But neither Ranger in his report or during testimony pointed to Lomely's response as somehow supporting reasonable suspicion that the occupants of the Honda were engaged in criminal activity.

<u>Occupants of Honda attempted to depart</u>:  when Ranger Brown announced his intention to Lomely and Moline that he intended to search the Truck, he also directed them to relocate from the vicinity of the Truck to the other side of the Honda while he searched.  Both Rangers attest that the Honda occupants' loading of the vehicle and attempt to depart thereafter shortly after learning the Rangers intended to search the Truck was "suspicious."  However, after being directed by Ranger Brown to relocate, Lomely immediately stated to Moline (within earshot of Ranger Brown), "we got to stop here Tom .. just let it go," apparently referencing the work they had undertaken to fix the disabled Truck.  Moline answered, "well, I guess that's it then … it's dark."  Lomely and Moline gathered their belongings and entered the Honda.

Under the totality of these circumstances, reasonable suspicion could not be heightened based on the Honda occupants' attempt to depart.  They maintained that they were only at the scene to assist with repairing the Truck, which had become untenable given the Rangers' direction that they stop their efforts and because the darkness in any event hindered their ability to continue with their repair efforts.

*     *     *     *     *

In sum, the government's arguments that the Rangers possessed reasonable suspicion that the Honda occupants were involved in criminal activity warranting their seizure of the occupants (including Defendant) is based on a selection of favorable facts without reconciliation of other compelling facts and circumstances that undermines reasonable suspicion.  Thus, even if some facts and circumstances might suggest reasonable suspicion exists, "the presence of additional facts might dispel reasonable suspicion." *Kansas v. Glover*, 589 U.S. 376, 386 (2020).  Here, notwithstanding the Rangers' initial observation of one of the Honda occupants demonstrating odd behavior that they first attest more than one year later they perceived as evidence of possible intoxication, early in the encounter, both Rangers undertook observations of the interior of the

Honda without observing any evidence of criminality.  *Cf. United States v. Gates*, 755 Fed. Appx. 649, 650 (9th Cir. 2018) ("Having a valid reason to approach the car [during a consensual encounter], one of the officers immediately saw the firearm in plain view on the seat next to Gates. In combination with the surrounding circumstances, this gave the officers reasonable suspicion that Gates might have been planning to rob the club or its patrons, and thus to conduct an investigatory stop.").  Further, although the Honda occupants were discovered in a purported high crime area, they offered a reasonable explanation for their presence there and the evidence the Rangers obtained in the first 20 minutes of their investigation corroborated that the Truck was disabled and the Honda occupants were there only to assist in repairing the Truck.

Stated otherwise, while the testifying Rangers offered "articulable" facts in support of their hunch that criminal activity was afoot, they provide little basis for how these factors were "suspicious" individually or in the aggregate in the context of the other facts and circumstances at the scene addressed above.

## **Conclusion and Order**

If law enforcement violates a defendant's Fourth Amendment right to be free from unreasonable searches and seizures, then, under the exclusionary rule, "all evidence seized as a result of the unconstitutional actions of law enforcement must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001).  "Under the 'fruits of the poisonous tree' doctrine, evidence seized subsequent to a violation of the Fourth Amendment is tainted by the illegality and subject to exclusion, unless it has been sufficiently 'purged of the primary taint.'"  *Willy*, 40 F.4th at 1089 (quoting *Wong Sun v. United States*, 371 U.S. 471, 485-88 (1963)).  Accord *United States v. Shetler*, 665 F.3d 1150, 1159-60 (9th Cir. 2011).  "Verbal evidence, including live-witness testimony, may be no less the 'fruit' of official illegality than is tangible, documentary evidence." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395 (9th Cir. 1989) (suppressing statements made in response to questions about fruits of unlawful search).

Here, reasonable suspicion supported neither the seizure of Defendant nor the search of the Honda and, thus, the search and seizure violated the Fourth Amendment.  Accordingly, the seized

evidence is suppressed.  Because Defendant's statement of owning the container that harbored suspected methamphetamine was elicited by law enforcement's questioning about the container only minutes after the container's illegal seizure, it follows that Defendant's statement likewise was the product of a Fourth Amendment violation, and, thus, is suppressed.

The parties are directed the file a joint report within 14 days of entry of this order in which they set forth their intentions for further prosecution, defense and scheduling of the action.

IT IS SO ORDERED.

Dated:   **December 19, 2024**

UNITED STATES MAGISTRATE JUDGE